125 P.3d 164 (2005)
130 Wash.App. 750
Bonnie S. SHIELDS, Appellant,
v.
MORGAN FINANCIAL, INC., Defendant,
Long Beach Mortgage Company, Respondent.
No. 55542-1-I.
Court of Appeals of Washington, Division One.
December 12, 2005.
*165 Aryeh Y. Brown, Seattle, for Appellant.
Fred B. Burnside, Stephen Michael Rummage, Seattle, for Respondent.
GROSSE, J.
¶ 1 Long Beach Mortgage Company complied with the requirement to provide an applicant for a federally related mortgage loan with a good faith estimate by placing it in the mail to them, not later than three business days after the application was received. The fact that the borrower did not receive the good faith estimate is not a basis for a claim under Washington's Consumer Protection Act (CPA). The summary judgment dismissing Bonnie Shields' action against Long Beach Mortgage Company is affirmed.

FACTS
¶ 2 In the fall of 1999, Shields began discussions with Morgan Financial, Inc. (Morgan) seeking a home mortgage loan. As there were blemishes on her credit report, Shields worked with Morgan to "clean up" her credit. About a year later Shields filled out a loan application for Morgan to use in contacting potential lenders. On November 2, 2000, Morgan submitted Shields' loan application to the Portland, Oregon branch of the Long Beach Mortgage Company (Long *166 Beach). Morgan submitted a broker's loan form seeking a specific loan for Shields; a 2-year adjustable rate loan in the amount of $243,100 with a beginning rate of 10.45 percent. The submission form indicated that Morgan would be compensated through a 2 percent loan origination fee to be paid from the loan proceeds, and a 1 percent premium-yield adjustment fee (yield spread premium) to be paid by Long Beach.
¶ 3 Long Beach received the loan application from Morgan and Shields on November 2, 2000. Under its normal business practices and procedures, Long Beach printed three copies of its disclosure and other forms and mailed Shields a letter and attachments including two copies of its Good Faith Estimate form, estimating the costs and fees of the loan for which Shields applied. The letter requested that Shields sign and return one copy of the disclosure forms in a provided self-addressed, postage-paid envelope. The third form was placed in Shields' file at Long Beach. Shields denies receiving any of these documents.
¶ 4 Long Beach agreed to loan Shields a lesser amount of $228,800 at a reduced interest rate of 10.2 percent. On November 22, 2000, Shields reviewed the loan documents at the office of an escrow agent. At that time Shields claims she first learned of the monthly payment on her loan, which was higher than she thought it would be.[1] Shields claims she called Morgan to complain about the rates and fees, but she went ahead and signed the loan documents, including the HUD-1 settlement statement detailing the fees associated with her loan.
¶ 5 The loan proceeds did not disburse until a week later, November 29, 2000. During the week, Shields did not register any complaint with Long Beach. To the contrary, Shields submitted a letter to Long Beach, explaining that her monthly income had increased to support the granting of the loan and why she had had some "derogs" on her credit report. Long Beach funded the transaction.
¶ 6 In April 2001, Long Beach sold Shields' loan and the servicing rights to Washington Mutual. Shields made timely payments until the month after Long Beach transferred the loan. Beginning in June 2001, apparently due to the fact that she lost her job, Shields started missing payments. Sometime thereafter Washington Mutual began foreclosure proceedings. In March 2003, over a year and a half after Long Beach sold her loan to Washington Mutual, Shields sold her home to her brother for a profit. After paying off her loan, Shields received a check for over $62,000. Shields continues to live in the home and paid the mortgage payments on her brother's loan.
¶ 7 About five months following the sale of her house, Shields sued Morgan and Long Beach. Under the complaint, Shields alleged basis for her claim against Long Beach related to the fact that it had not fully disclosed the yield spread premium paid to her mortgage broker.
¶ 8 After the complaint was filed, Morgan and Long Beach responded to discovery requests. The majority of Shields' complaint was directed against Morgan, the broker. Before trial, Morgan and Shields settled. Long Beach produced its file relating to Shields' loan as well as its policy and training manuals relating to loan disclosures. Long Beach also produced a corporate designee to testify at a deposition about the facts underlying Shields' loan, Long Beach's interaction with mortgage brokers and its policies and procedures for providing loan disclosures to potential borrowers. Shields later filed a motion to compel production of all documents associated with every Long Beach loan brokered by Morgan between 1999 and 2003 in several western Washington counties. Shields argued she needed the files to satisfy the public interest element of the CPA. But Long Beach indicated it would not contest the public interest issue, so the trial court denied the motion to compel.
¶ 9 Shields then scheduled the depositions of the Chief Financial Officer (CFO) and the Chief Compliance Officer (CCO) of Long *167 Beach. Counsel for Long Beach objected and filed a motion for a protective order. The CFO and the CCO had no personal knowledge of Shields' file. The trial court entered a protective order denying the deposition.
¶ 10 Long Beach and Shields filed cross-motions for summary judgment. Shields motion addressed her allegation that Long Beach had not satisfied its duty to make loan disclosures under federal law by placing the disclosures in the mail, if, in fact they did. But without amending her complaint, she also attempted to raise new theories of recovery in her motion: (1) that Long Beach violated the CPA by approving her loan application; and (2) that Long Beach's payment of the yield spread premium was an illegal kickback. Long Beach then sought to strike the declaration of Shields expert. Additionally, Long Beach's motion for summary judgment sought dismissal of the action because it fully complied with the Real Estate Settlement Procedures Act (RESPA) notice requirements and absent a failure to comply it could not be found to violate RESPA, Truth in Lending Act (TILA) and thus the CPA.
¶ 11 After argument, the trial court denied the motion to strike, but granted Long Beach's motion for summary judgment, dismissing the action. The trial court indicated sets forth that as a matter of law Long Beach complied with the notice requirements, and further noted there was insufficient competent evidence to prove any unfair or deceptive act by Long Beach even under any new theories presented. Shields appeals.

ANALYSIS
¶ 12 The usual standard of review for summary judgment applies. "We review a grant of summary judgment de novo applying the same standard as the trial court."[2]
¶ 13 Under Washington's CPA, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful.[3] The question of whether a particular action gives rise to a violation of the CPA is reviewable as a question of law.[4] Elements of a claim under the CPA are (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) that impacts the public interest, (4) injury to plaintiff's business or property, and (5) which injury is causally related to unfair or deceptive act.[5]
¶ 14 Under the complaint, the only act or practice Shields alleges to be unfair or deceptive is that Long Beach failed to fully and properly disclose fees paid and collected in conjunction with her loan. Shields claims that RESPA requires Long Beach to take more steps that it did to ascertain that a Good Faith Estimate was delivered to the borrower. We disagree.
¶ 15 The record before the court shows that Long Beach personnel follow a procedure for the mailing of disclosure documents. Upon receipt of a brokered loan form containing information about the loan and potential borrower, Long Beach personnel load the relevant information into a computer database creating a loan file for the borrower. The computer creates and prints three copies of the required loan disclosures, as well as other documents. Long Beach then mails two of the three copies to the potential borrower, usually on the same day the application is received, along with an explanatory letter and a request that the applicant sign and return one copy of the disclosure documents to Long Beach. Long Beach personnel place the third copy in the borrower's loan file. The third copy of Shields' document *168 is in her Long Beach loan file. However, her file did not contain a returned signed copy.
¶ 16 Shields argues that summary judgment is precluded because she did not receive the required disclosures and, therefore, there is a question of fact as to whether Long Beach actually mailed them.
¶ 17 The regulations implementing RESPA, 12 U.S.C. sections 2601-2617, and the TILA, 15 U.S.C. sections 1601-1693, require that a lender disclose certain information to a borrower within three days of receiving a loan application. Under RESPA's disclosure regulation, 24 C.F.R. section 3500.7(a), a lender satisfies its RESPA disclosure obligation "either by delivering the good faith estimate or by placing it in the mail to the loan applicant, not later than three business days after the application is received or prepared." Further, mailing of the disclosure forms is addressed under 24 C.F.R. section 3500.11, providing that RESPA requirements "shall be deemed to be satisfied by placing the document in the mail (whether or not received by the addressee) addressed to the addresses stated in the loan application...."[6] The regulation expressly states that receipt is irrelevant in determining whether disclosure obligations have been satisfied. This is consistent with Washington case law.[7]
¶ 18 Shields argues that 24 C.F.R. section 3500.7(b) requires a mortgage broker to provide a good faith estimate within three days of receiving a loan application, but that the funding lender must also ascertain that a good faith estimate from the mortgage broker has been delivered. But a plain reading of the C.F.R. does not support Shields' argument. A lender's obligation to ascertain the broker's delivery of the good faith estimate arises only when the lender decides to rely on the broker's good faith estimate rather than mailing its own disclosure.[8] Long Beach satisfied its RESPA requirement by mailing its own disclosure forms and the decision that Long Beach did not violate the CPA under this theory is correct.
¶ 19 During her deposition at the close of discovery Shields was asked if Long Beach committed any acts she deemed unfair aside from the alleged failure to provide timely disclosure. She identified none. However, in response to Long Beach's summary judgment motion Shields presented a number of additional theories for Long Beach's alleged unfair acts in violation of the CPA. She claims that Long Beach manipulated her debt to income ratio to make her loan fit within its guidelines, thus resulting with an unconscionable loan. She also claims that Long Beach paid unearned fees (yield spread premium) to Morgan Financial as an illegal kickback. Shields' response relies on liability theories she never pleaded in her complaint. Even under the broadest reading of CR 8's notice pleading requirements, the complaint does not allege these new theories and Shields failed to amend or even attempt to amend her pleadings. Further, assertions made by Shields are speculative at best or not based on competent evidence. Even the evidence provided by Shields' expert, Laurie Sundby, especially when contrasted with her testimony at deposition, shows there is insufficient competent evidence to support the claims had they been properly made. Further, Shields sent a letter to Long Beach explaining the blemishes on her credit record and continuing to request funding after she signed at closing, but before the loan funded. Summary judgment dismissing Shields' claims was properly granted.
¶ 20 Additionally, Shields contends the trial court erred in denying a motion to compel production of loan files of other Western Washington Long Beach borrowers in order to prove the "public interest" element of the CPA claim. Further, she claims the trial *169 court erred by granting a protective order preventing the depositions of two high level Long Beach corporate officers.
¶ 21 First, even had the requested discovery been granted, it would not have created a genuine issue as to any material fact. "A material fact is one upon which the outcome of the litigation depends, in whole or in part."[9] Where proof of an essential element of a claim is lacking, all other facts are rendered immaterial.[10] Shields' discovery claims do not bear on the issue at summary judgment for none of the discovery would have shown whether Long Beach made the required disclosures to Shields under the C.F.R.
¶ 22 Even if we address the issues, the standard of review for the trial court's grant of a protective order and for controlling discovery is abuse of discretion.[11] We find no abuse of discretion.
¶ 23 Shields' claim that she required the loan files of other Long Beach borrowers was based on her need to satisfy the public interest element of the CPA. Long Beach said it had no intention of contesting the public interest issue. The information sought was irrelevant and not required and the denial of the motion to compel was not an abuse of the trial court's discretion.
¶ 24 In addition, the protective order granted was within the trial court's discretion. Shields argues the trial court abused its discretion in denying her the chance to depose the CFO and the CCO of Long Beach. But neither of these high level officers had any knowledge of specific facts pertaining to Shields' loan. On appeal, Shields no longer attempts to justify the deposition of the officers on the stated original grounds. Additionally, Long Beach produced Shields' loan file and identified all the individuals who worked on the loan. The company produced a senior executive, Jay Weisbrod, to testify at a deposition regarding Long Beach's disclosure process and policies and to answer other relevant questions. CR 26(b)(1) sets forth that when appropriate, a trial court shall limit requested discovery to suit the case. Further, under CR 26(c) a protective order can be used to regulate discovery for good cause when the discovery sought is unreasonably cumulative or duplicative, when the party seeking discovery has had ample opportunity to obtain the information, or if the discovery is unduly burdensome or expensive, taking into account the needs of the case. A review of the record shows that a protective order barring the deposition of Long Beach's high level corporate executives was appropriate under CR 26(b)(1) and (c). There was no abuse of discretion.
¶ 25 The decision to deny the motion to compel additional discovery, the grant of the protective order and the order granting summary judgment are affirmed.
WE CONCUR: COX, C.J., and COLEMAN, J.
NOTES
[1] A second mortgage was contained in the financing package, but there are no claims that this portion of the financing is part of the appeal.
[2] City of Seattle v. Mighty Movers, Inc., 152 Wash.2d 343, 348, 96 P.3d 979 (2004) ("Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c)").
[3] RCW 19.86.020.
[4] Svendsen v. Stock, 143 Wash.2d 546, 553, 23 P.3d 455 (2001) (citing Keyes v. Bollinger, 31 Wash.App. 286, 289, 640 P.2d 1077 (1982)).
[5] First State Ins. Co. v. Kemper Nat'l Ins. Co., 94 Wash.App. 602, 608-09, 971 P.2d 953 (1999); Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wash.2d 778, 780, 719 P.2d 531 (1986).
[6] (Emphasis added.)
[7] See Tremmel v. Safeco Ins. Co., 42 Wash.App. 684, 689, 713 P.2d 155 (1986) ("When a statute authorizes the giving of notice by mail, the fact that the mail is properly posted and addressed to the person to whom notice is required is prima facie evidence that the statute was fully complied with and that the notice was effectively given.... Proof of receipt is not required.").
[8] See Bankers Trust v. McFarland, 192 Misc.2d 328, 743 N.Y.S.2d 804, 807 (N.Y.Sup.Ct.2002) (contrasting 24 C.F.R. § 3500.7(a) with 24 C.F.R. § 3500.7(b)).
[9] Hisle v. Todd Pac. Shipyards, 151 Wash.2d 853, 861, 93 P.3d 108 (2004) (quoting Barrie v. Hosts of America, Inc., 94 Wash.2d 640, 642, 618 P.2d 96 (1980)).
[10] Young v. Key Pharms., 112 Wash.2d 216, 225, 770 P.2d 182 (1989) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).
[11] King v. Olympic Pipe Line, 104 Wash.App. 338, 348, 16 P.3d 45 (2000) ("A trial court abuses its discretion only if its ruling is manifestly unreasonable or is based upon untenable grounds or reasons.").